T.C. Memo. 1996-372


UNITED STATES TAX COURT


ESTATE OF ROSS H. FREEMAN, DECEASED,
DENNIS HERSEY, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22427-93.                    Filed August 13, 1996.


        R determined a deficiency in estate tax.  The sole
   issue for decision is the fair market value on the date
   of decedent's death of certain shares of common stock
   and an option to acquire additional shares of common
   stock that were properly includable in decedent's gross
   estate.
        <u>Held</u>:  R's valuation of such shares and the option
   is sustained, except that allowance will be made for
   the exercise price of the option shares.


<u>Leroy J. Neider</u>, for petitioner.

<u>Kimberley J. Peterson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  Respondent determined a deficiency in Federal estate tax of $1,489,660.  The adjustment giving rise to the deficiency is on account of respondent's increase in the value of certain shares of stock (and an option to acquire additional shares of stock) included in the gross estate.  Petitioner has assigned error to that adjustment, and we must decide the value of those shares.

Unless otherwise noted, all section references are to the Internal Revenue Code as in effect at the time of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some facts have been stipulated and are so found.  The stipulation of facts filed by the parties and the accompanying exhibits are incorporated herein by this reference.  Some of respondent's proposed findings of fact have been conceded by petitioner and, accordingly, are so found.[1]

---

[1]    In part, Rule 151 provides as follows:

RULE 151. BRIEFS

*    *    *    *    *    *    *

(e) Form and Content:  * * *

*    *    *    *    *    *    *

(3) * * * In an answering or reply brief, the party
(continued...)

Introduction

Decedent died on October 22, 1989. Among the assets includable in decedent's gross estate are: (1) 702,000 shares of common stock in Xilinx, Inc. (the corporation), and (2) an option to acquire from the corporation an additional 13,333 of its common shares (hereafter, both (1) such already owned shares and (2) such option shares being referred to, without distinction, as either "the shares" or "the shares of the corporation").[2]

_____

[1](...continued)
shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact.

Petitioner has filed an answering brief, but petitioner has failed therein to set forth objections to the proposed findings of fact made by respondent. Petitioner has simply set forth therein the proposed findings made in its opening brief and again asked the Court to make those findings. Accordingly, we must conclude that petitioner has conceded respondent's proposed findings of fact as correct except to the extent that petitioner's proposed findings are clearly inconsistent therewith. See Fein v. Commissioner, T.C. Memo. 1994-370; Estate of Stimson v. Commissioner, T.C. Memo. 1992-242; Cunningham v. Commissioner, T.C. Memo. 1989-260.

[2] In the stipulation of facts and in their briefs, the parties have generally referred to the 702,000 shares of common stock and the 13,333 option shares as the "shares" of the corporation. Each party has argued for a particular value to be applied to each of the shares; i.e., the same value to be applied both to each of the shares already acquired by decedent and to each of the option shares. Indeed, in the estate tax return, petitioner states a "unit value" for each of the option shares ($1.05) that is the same as the per-share value of each of the acquired shares. The parties, however, have entered into a subsequent stipulation that the value of the option shares is equal to the value of the shares of common stock, reduced by 35 cents, which

(continued...)

Petitioner timely made an estate tax return on Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (the Estate tax return).  Petitioner did not elect alternate valuation.  In the estate tax return, petitioner valued the shares at $1.05 per share.

Respondent determined a deficiency in estate tax by a letter dated July 21, 1993.  In a statement attached to that letter, respondent explained her determination by stating that she had increased the value of the shares to $4.94 per share.

Organization of the Corporation

The corporation is a California corporation, organized in 1985.  Decedent was one of the founders of the corporation.  The corporation's Standard Industrial Code is 3674, Semiconductors and Related Devices.  The corporation is a leader in the field of programmable logic devices.  The annual accounting period of the corporation is a fiscal year ending on March 31.  (Hereafter, when referring to financial data of the corporation for a particular year, we will be referring to financial data for the fiscal year ending on March 31 of that year.)

---

[2](...continued)
amount represents the exercise price of those option shares.  For purposes of this opinion, we will adopt the convention of the parties and, without distinction, generally refer to both the shares already acquired by decedent and to the option shares as the "shares" of the corporation.

Capital Structure

At the time of decedent's death, there were outstanding one series of common stock of the corporation and eight series of preferred stock.  With the exception of the Series F preferred stock, all series of preferred stock were convertible to common stock at the ratio of 1 to 1.  The Series F preferred stock was convertible at the ratio of 1.05 shares of common stock to 1 share of preferred.

Financial Performance

From 1986 through 1989, the corporation's revenues and net income were as follows:

| FYE | Revenues | Net Income |
|-----|----------|------------|
| 1986 | $435,000 | ($4,928,000) |
| 1987 | 4,375,000 | (5,080,000) |
| 1988 | 13,755,000 | (1,689,000) |
| 1989 | 30,445,000 | 4,382,000 |

Private Sales of Stock

From its inception through June 1990, the corporation sold 13,331,060 shares of preferred stock at prices ranging from $1 to $4.

On August 24, 1989, common stock of the corporation was authorized to be sold to certain outside sales representatives of the corporation for $1.25 a share.  On December 8, 1989, common stock of the corporation was authorized to be sold to certain outside sales representatives of the corporation for $2.25 a share.  The purpose of those sales was to give those sales

representatives a direct financial interest in the success of the corporation.

On July 7, December 8, and December 31, 1989, incentive stock options were granted to certain employees for $1.25, $2.25, and $2.25 a share, respectively. All such options were to vest over 5 years.

## Public Offering

The corporation had an initial public offering of stock in June 1990, at a price of $10 per share. The possibility of an initial public offering was discussed at a meeting of the board of directors of the corporation on August 24, 1989.

## Technology Sharing Agreement

On June 9, 1986, the corporation entered into a 3-year technology sharing agreement (the agreement) with Monolithic Memories, Inc. (MMI). Among other things, the agreement accorded MMI rights in certain present and future technology of the corporation. In April 1987, Advanced Micro Devices (AMD) acquired MMI and succeeded to MMI's rights under the agreement. In 1990, the agreement was terminated.

## Respondent's Expert

Respondent presented as her expert witness Herbert T. Spiro (Spiro), who was accepted by petitioner as an expert and whose written report was received in evidence as his direct testimony. Spiro reached the conclusion, supported by his report, that the aggregate fair market value of the shares, as of October 22,

1989, on an illiquid minority basis, was $3,530,575, or $4.94 a share.  Subsequently, respondent came to realize that Spiro had made a computational error, and offered a correction to Spiro's conclusion; viz, that the value of the shares was $3,004,399, or $4.20 a share.

In reaching his conclusion, Spiro relied on numerous factors, including, specifically, the following:  (1) An analysis of the corporation's operating results and financial condition; (2) an analysis of the U.S. economy and the semiconductor industry; (3) a forecast of operations after the date of valuation; and (4) an investigation of the prices that investors were paying for the stock of comparable publicly traded companies.

Spiro's analysis of the corporation's financial condition was based primarily on his review of the corporation's annual reports and Forms 10-K and 10-Q for 1985 through 1989, an income statement of the corporation for the 6-month period ending September 30, 1989, and a Form S-1, filed on April 27, 1990, in connection with the corporation's initial public offering.

For the first half of 1990, revenue was $21,771,000, which, if annualized, would be $43,542,000 for 1990, a 43-percent increase over 1989.  Spiro concluded, however, that, given the corporation's growth in sales, it was unlikely that there would be no growth in sales during the second half of 1990.  Therefore, he expected that the corporation's growth in sales for 1990 would

exceed 43 percent. Spiro thought that the company's growth rate was "meteoric" when compared to a 25-percent growth rate in 1989 for the semiconductor industry. Spiro concluded that the corporation's growth rate was higher than any publicly traded comparable company that he examined other than one.

For the first 6 months of 1990, operating income was $3,606,000, which, if annualized, would be $7,212,000. Spiro concluded, however, that, if sales for the first 6 months of 1990 continued to grow, and expenses continued to decline as a percentage of sales, then operating income would be even greater. The corporation's actual operating income for 1990 was $8,846,000.

Spiro's analysis of the corporation's financial position also included an examination of the corporation's gross profit margins, research and development expenses, marketing, general and administrative expenses, interest income and expenses, tax position, profitability, assets, liabilities, and book equity value.

Spiro determined the value of the shares using both an income and a market approach.

Under the income approach, Spiro projected the cash-flow available for distribution for 5 years. He made assumptions about future levels of sales, expenses, and taxes to estimate annual available cash-flow. After making certain adjustments, he calculated the present value of that income stream and added to

it an amount to reflect the future value of the corporation at the end of 5 years. He then divided that result by the number of shares that were outstanding on the appropriate valuation date to derive a value for each such share. The value he so derived was $5.65. Because shares of the corporation were not readily marketable on that date, he then applied a liquidity discount to yield a final estimate of value. Although he recognized that a 35-percent liquidity discount had come to be regarded as an average discount, he applied a discount of only 10 percent. He did so because he thought that an initial public offering of shares of the corporation was likely, based on (1) the ownership of a substantial portion of the corporation by venture capitalists, (2) the recent history of public offerings by similar companies, and (3) his assumption that decedent would have been aware of (and would have communicated to any potential buyer) steps towards a public offering that already had been taken by the corporation. Spiro thus computed a per-share fair market value for the shares of $5.09 using the income approach.

Under the market approach, Spiro first made a list of public companies that he considered comparable to the corporation. He then identified those on the list that resembled the corporation sufficiently closely in terms of both earnings per share and growth in earnings per share. For those three companies, he used certain market value indicators (e.g., the ratio of price to recent earnings) to derive a range of market values for shares of

the corporation. He then averaged the appropriate market values to derive a value for a share of the corporation of $5.41. As with the income approach, Spiro applied a liquidity discount of 10 percent to arrive at a per-share value of $4.87 under the market approach.

Spiro then reconciled the values he had reached under the income and market approaches by assigning weights to the results reached under each. Because of the difficulty associated with forecasting the financial performance of startup, high growth companies, Spiro accorded greater weight to the result reached under the market value approach. He gave the market value approach a 70-percent weight and gave the income approach a 30-percent weight. Using that approach, he concluded that the aggregate fair market value of the shares was $3,530,575, or $4.94 a share.

Spiro erred in calculating the value of the shares under the income approach. He erred in calculating the future value of the corporation after 5 years. Correcting that error results in a value per share under the income method of $2.63 and a weighted average fair market value of $4.20 per share, or $3,004,399 for all the shares.

Petitioner's Expert

Petitioner presented as its expert witness David L. Klemm (Klemm), who was accepted by respondent as an expert and whose written report was received in evidence as his direct testimony.

Klemm reached the conclusion, supported by his report, that the fair market value of the shares, as of October 22, 1989, on a minority interest basis, was $729,700, or $1.02 a share.[3]

In reaching his conclusion, Klemm relied on numerous sources of information, including, specifically, the following:

1. Financial statements for the corporation for 1986 through 1989;

2. An equipment list and a depreciation schedule as of the end of 1989;

3. Industry information gathered from various sources;

4. Information on the U.S. economy gathered from various sources;

5. Information on comparative publicly traded companies gathered from various sources; and

6. An interview with Bernard V. Vonderschmitt, president of the corporation.

Klemm did not analyze financial statements for the corporation for the first 6 months of 1990. He did consider financial results for the first quarter of 1990, and he concluded that revenue and pretax earning levels were "generally in line" with such levels for the prior two quarters. Klemm did not make any forecasts of future growth or sales.

---

[3] Klemm calculates a value for the shares of $729,700 by multiplying the number of shares (715,333) by $1.02. The number 715,333 multiplied by $1.02 is $729,640, rounded to the nearest dollar.

Klemm determined the value of the shares based on (1) a capitalization of the corporation's 1989 earnings, (2) a capitalization of the corporation's 1989 revenues, and (3) a return-on-equity analysis using the book value per share as of the end of 1989.

To capitalize the corporation's 1989 earnings Klemm utilized a capitalization rate that, in his report, he did not relate to any specific publicly traded companies but merely stated was "appropriate" after discussing the "price/earnings ratio of the Dow Jones Industrial Average" at October 20, 1989, and the range of that average for 5 years. In his report, Klemm did not explain the capitalization rate that he used to capitalize the corporation's revenues. To perform his return-to-equity analysis, Klemm again referred to Dow Jones Industrial Averages but failed to specify any companies comparable to the corporation. Klemm had prepared an earlier report valuing the shares, which was appended to the estate tax return filed by petitioner. In that earlier report, Klemm listed eight publicly traded companies that he considered comparable to the corporation. Seven of those eight companies were omitted from the report received as Klemm's testimony. One company (Altera Corp.) is mentioned, but no analysis of that company to support Klemm's valuation methods is provided.

Using his three approaches, Klemm arrived at the following three indications of value for each of the shares:

| Approach | Indicated Value |
|---|---|
| Capitalization of 1989 earnings | $1.87 |
| Capitalization of revenues | 1.75 |
| Price/book value | 1.48 |

Without explaining the weight to be given to each approach, other than stating that the most weight should be given to 1989 earnings, less weight should be given to price/book value, and the least value should be given to revenues, Klemm opined that the publicly traded equivalent value of the shares on a per-share basis, as of October 22, 1989, was $1.70

Klemm then applied two discounts to the $1.70 per-share value. He first applied a 20-percent discount to reflect the minority position that an owner of the shares would have. He then applied a 25-percent discount to reflect the lack of an established market for the shares.

Taking into account the two discounts that he had applied, Klemm concluded that the fair market value of the shares, on a minority interest basis, was $729,000, or $1.02 per share.

In his interview with Bernard V. Vonderschmitt, president of the corporation, Klemm did not inquire as to whether, on October 22, 1989, the corporation had any plans for a public offering of stock. He did not consider the potential for a public offering in valuing the shares.

Value of the Shares

The fair market value of the shares, on a per-share basis, was $4.20 on October 22, 1989.

OPINION

I. <u>Introduction</u>

We must determine the fair market value of the shares of the corporation on October 22, 1989, the date of decedent's death. The shares were included by petitioner in the gross estate and reported on the estate tax return at a value of $1.05 per share. In determining a deficiency in estate tax, respondent valued the shares at $4.94. Respondent now argues that the value of the shares is no less than $4.20 per share. We interpret respondent's change in position as a concession of a portion of the deficiency, and we accept that concession. Petitioner now argues that the value of the shares is $1.02 per share. A decision for petitioner on that basis would necessarily mean that petitioner had overpaid the estate tax. Petitioner failed to raise the issue of an overpayment in the petition. Because we find no overpayment, we need not deal with the consequences of that failure.

II. <u>Law</u>

Section 2001(a) imposes a tax on "the transfer of the taxable estate of every decedent who is a citizen or resident of the United States." Section 2031(a) provides: "The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated."

The standard of valuation is fair market value. Section 20.2031-1(b), Estate Tax Regs., defines fair market value as: "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." Future events that were reasonably foreseeable at the valuation date may be taken into account in determining fair market value. Gray v. Commissioner, 2 B.T.A. 672, 682 (1925); Estate of Livermore v. Commissioner, T.C. Memo. 1988-503. In determining the value of unlisted stock and securities, we take into consideration, among other factors, the value of publicly traded stock or securities of corporations in the same or a similar line of business. Sec. 2031(b).

Petitioner bears the burden of proof. Rule 142(a).

III. Testimony

Both petitioner and respondent rely heavily, if not exclusively, on expert testimony to establish the value of the shares on the date of decedent's death. Indeed, respondent's only witness was respondent's expert witness, Spiro. Petitioner also called one expert witness, Klemm. Petitioner called two lay witnesses, Bernard V. Vonderschmitt and Frank Quattrone, neither of whom had an opinion as to the value of the shares.

We found both of petitioner's lay witnesses to be straightforward and believable. We have taken their testimony into account. Like the parties, however, we rely heavily on

expert testimony in making our finding as to the value of the shares.  We found Spiro to be convincing, and we agree with his valuation, as corrected by respondent, as to the value of the shares.  We had difficulty with Klemm's valuation, and we will set forth some of our more significant concerns.  We accorded Klemm's valuation no weight.

IV.  Klemm's Testimony

   A.  Approaches to Valuation

Klemm followed three approaches in valuing the shares: Capitalization of earnings, capitalization of revenues, and return on equity.  His aim was to find the price that the market would set for a share of the common stock of the corporation on October 22, 1989.  Under each approach, such a market price was the unknown to be discovered.  Under each approach, that unknown was a function of two variables, one particular to the corporation (e.g., earnings) and one reflective of the market (i.e., a variable characteristic of publicly traded companies comparable to the corporation).  Our first major concern is with Klemm's identification of variables characteristic of publicly traded companies comparable to the corporation.  Simply put, petitioner has failed to persuade us that Klemm identified companies comparable to the corporation and used data with respect to those companies to derive the appropriate market-reflective variables.  In our findings of fact, we pointed out the discrepancy between Klemm's earlier report and his expert

testimony with respect to the identification of comparable companies.  Except perhaps for one company, no comparable companies are identified in his expert testimony.  During his oral testimony, Klemm tried to explain that discrepancy; he also asked that his expert testimony be amended to make his earlier identification of comparable companies part of that testimony. We cannot reconcile his explanation of why he took the comparables out (which we do not fully comprehend) with his request to amend his expert testimony and add them back in.  We have little confidence in his quantification of appropriate variables reflective of the market (e.g., capitalization rates). Klemm's oral testimony has raised for us serious doubts as to his understanding of the approaches to valuation that he selected. That, alone, is sufficient reason for us to reject the conclusions resulting from those approaches.

We are also concerned that in relying on his three approaches Klemm ignored the dynamic state of the corporation, which had experienced exceptional growth in both revenues and earnings since its inception.  We can find in neither Klemm's identification of (1) market variables or (2) variables particular to the corporation (e.g., earnings) nor in his manipulation of those variables any recognition that <u>future</u> earnings and revenues might be any different than they were in 1989 (i.e., that earnings and revenues would continue to grow). Although, in the body of his report, Klemm takes note of the

growth since inception of both the corporation's earnings and revenues, and although an income statement for the first 6 months of 1990 was reasonably available to him, which showed continued growth in both earnings and revenues, Klemm does not specifically acknowledge such growth (or any future growth) in any of the approaches that he adopted. He seems to contradict his own statement, in introducing his valuation approaches, that "Value measures generally take into account the trends in growth, performance, and stability of * * * [earnings, revenue, and book value]." We are unpersuaded that his static view of the corporation's future was either necessary or correct.

We are unconvinced that, either individually, or in conjunction, Klemm's approaches to valuation of the shares produce a reliable result.

B. Public Offering

The corporation had an initial public offering of stock in June 1990, at a price of $10 per share. The possibility of an initial public offering was discussed at a meeting of the board of directors of the corporation on August 24, 1989. In his report, Klemm states specifically that (1) during his interview with Bernard V. Vonderschmitt, president of the corporation, he did not inquire as to whether, on October 22, 1989, the corporation had any plans for a public offering of stock, and (2) he did not consider the potential for a public offering in carrying out his valuation assignment.

Petitioner has cited to us no authority prohibiting an inquiry into plans for a public offering. We assume that a potential purchaser would be interested in such plans and might pay a premium depending on her judgment of the likelihood of such an offering. Indeed, in his report, Klemm tells us that (1) professional investment firms had purchased the preferred stock in the corporation, and (2) it is typical for a high technology startup company to sell convertible preferred shares to venture capital investors. We assume that venture capital investors invest with the hope, if not the expectation, that a public offering will not be too far off.

Klemm's failure to take any account of a public offering, which actually occurred within 8 months of decedent's death, and the possibility of which was discussed before his death, seems to us unwarranted. It seems to us that Klemm turned his back on a datum that he should have considered. Klemm's decision to ignore the possibility of a public offering adds to our dissatisfaction with his report. Cf. Messing v. Commissioner, 48 T.C. 502, 509 (1967) (public offering price is a factor to be taken into account in valuing shares of stock in a company that was privately held on the valuation date; due regard must be give "to the time span involved between the critical dates and the dates of sale to the public, as well as to the contingencies inherent in the successful culmination of a contemplated public offering.").

C.  Minority Discount

Klemm applied a 20-percent discount to reflect what he believed would be the minority position that a purchaser of the shares would have.  We think that that is inappropriate.  Klemm did not arrive at a value for the corporation and then try to determine the value of minority interest.  He arrived at a market equivalent value for a share of the corporation and then multiplied to arrive at the value of the shares.  We assume that, in valuing a single share of stock, the market would recognize the minority position of that share, and that no further minority discount would (or could) be demanded.

V.  Spiro's Testimony

A.  Analysis

We will summarize our reasons for agreeing with respondent's valuation of the shares.

We found Spiro's use of the income and market approaches to be straightforward and reasonable.  With respect to his use of the income approach, we agree with his adjustments to income and his use of a 5-year projection.  We do not think that he overestimated either base revenues, expected revenue growth, or the other factors and adjustments going into the calculations of expected cash-flows.  We are satisfied with his choice of a discount rate of 23.3 percent as appropriate for the corporation. We agree with his calculation of the present value of the 5-year expected cash-flows.  We agree with the necessity to add to that

sum the present value of cash-flows expected after year 5 (the reversion). We agree with respondent's corrected computation of the present value of the reversion.

Also, we are satisfied with his use of the market approach. Indeed, three of the companies selected by Spiro as comparable were selected by Klemm in his initial report, which accompanied the estate tax return.

We agree with Spiro's application of a liquidity discount of 10 percent. We also agree with the weight he gave the results reached under the two approaches.

B. Petitioner's Criticism

Petitioner has criticized Spiro's testimony on numerous grounds. Implicitly, we have dealt with most of that criticism in our analysis of Spiro's report. We have not, however, dealt with petitioner's claim that Spiro failed to recognize the effect on the value of the shares of the June 9, 1986, technology sharing agreement (agreement) entered into with Monolithic Memories, Inc. (MMI). The agreement was terminated in 1990. The agreement, argues petitioner, decreased the corporation's earnings potential (and therefore decreased the value of the corporation) because MMI (and later its successor, AMD) could produce and sell, at lower prices, products using the corporation's technology.

We do not think that Spiro failed to take the agreement into account. The pace of change for technology in the computer

industry is rapid. If the agreement had had any effect on earnings, it is likely that that effect would have made itself felt during 1989 and the first half of 1990. Spiro relied heavily on the financial figures for those periods. Implicitly, he took the agreement into account. The agreement was canceled in 1990.

Petitioner's expert, Klemm, testified that he did not assign a particular value or a particular discount to the shares due to the agreement.

We conclude that the agreement was of little consequence to the value of the shares.

VI. Conclusion

We have found that the fair market value of the shares, on a per-share basis, was $4.20 on October 22, 1989. The value of the 715,333 shares in issue is, thus, $3,004,399. Petitioner understated the value of the gross estate, and we sustain respondent's determination of a deficiency to the extent necessary to reflect the values that we have found and the stipulation of the parties as to the option shares.

Decision will be entered

under Rule 155.